For the reasons assigned, the judgment appealed from is affirmed.

O'NIELL, C. J., absent.

On Dismissal of Appeal as to one Appellee.

PER CURIAM. All issues involved in this case as between the plaintiff Pierson and the defendant Castell Land & Harbor Company, Inc., have been compromised, as appears from a joint motion filed by all the attorneys representing the appellant and appellees; and all of said parties having asked that the appeal be dismissed, in so far as the said Castell Land & Harbor Company, Inc., is concerned.

It is accordingly so ordered.

(105 So. 278)

No. 27276.

LOUISIANA FARM BUREAU COTTON GROWERS' CO-OP. ASS'N v. BACON et al.

In re LOUISIANA FARM BUREAU COTTON GROWERS' CO-OP. ASS'N.

(June 22, 1925.)

*(Syllabus by Editorial Staff.)*

1. Certiorari 39 — Mandamus 143(1) — Prohibition 18—Application for certiorari, prohibition, and mandamus held not premature.

Where relator could assume that if it failed to produce contracts called for in subpoena duces tecum, facts set out in motion would be taken for confessed, which fact would have re-sulted in rejection of its demand, its application for certiorari, prohibition, and mandamus to Supreme Court was not premature.

2. Witnesses 16—Refusal to comply with demand for subpoena duces tecum is confession of facts stated and sworn to.

On refusal to comply with demand for subpoena duces tecum, facts stated and sworn to are confessed.

3. Witnesses 16—If order for production of documents illegally or improvidently issued, relator could invoke supervisory power of Supreme Court.

If order to produce documents was illegally or improvidently issued, relator had right to refuse to comply therewith and to invoke supervisory power of the Supreme Court.

4. Witnesses 16—Statute authorizing subpoena of documents not strictly or literally interpreted.

Code Prac. arts. 140, 473, authorizing litigant to compel his adversary to bring into court books and papers in his possession, and which are material in the cause, are not strictly and literally interpreted.

5. Witnesses 16 — Compelling plaintiff to produce contracts or copies thereof held too great burden to impose.

Where it would be harsh and unreasonable to compel plaintiff to produce more than 5,000 marketing agreements called for by subpoena duces tecum, and onerous, burdensome, and expensive to have certified copies made, compelling it to produce them would be unjust, unfair, and impose too great burden.

6. Witnesses 16—Applicant must show exhaustion of other sources of information before books and papers are ordered produced.

If application for production of books and papers as evidence shows that there are other sources of information open to the party, applicant must show exhaustion of such sources.

7. Witnesses 16—Defendant, having means to acquire information he hoped to obtain by production of contracts, could not shift expense of producing them.

Where defendant, as member of plaintiff association, could inspect its books, and obtain therefrom all information he desired or hoped to prove by production of originals or copies of contracts, he could not shift burden of expense of producing originals or making copies by application for subpoena duces tecum to require their production.

Action by the Louisiana Farm Bureau Cotton Growers' Co-operative Association against J. E. Bacon and another. Plaintiff's exception to rule for subpœna duces tecum was overruled, and it applied to the Supreme Court for writs of certiorari, prohibition, and mandamus. Writs made peremptory, and order for subpœna vacated and set aside.

Taylor & Porter, of Baton Rouge, for relator.

R. Lee Garland and Wm. Alex. Robinson, both of Opelousas, for respondent Bacon.

THOMPSON, J. The relator is a nonprofit co-operative marketing association with no capital stock. It is composed exclusively of cotton growers of Louisiana. It was incorporated under the provisions of Act 57 of 1922, known as the Co-operative Marketing Act.

The articles of incorporation were filed in the clerk's office of East Baton Rouge parish and with the secretary of state in February, 1923. The city of Baton Rouge is the legal domicile, but the association maintains branch offices in the cities of New Orleans and Shreveport.

The declared object and purpose of the association is to promote, foster, and encourage the business of marketing cotton under a co-operative plan by cotton growers with the hope and expectation of stabilizing the cotton market, and as far as possible to reduce vicious speculation and manipulation of prices of that agricultural product.

In anticipation of effectuating such an organization, a number of cotton growers met in the early part of 1922 and selected an organization committee composed of 32 cotton growers which was charged with the duty of formulating a plan for such an organization and securing membership therein. The committee prepared and, through solicitors, circulated for signature a printed form of agreement called "marketing agreement," some of the pertinent stipulations of which are:

That the cotton growers will become members of the association to be organized under the Co-operative Marketing Act when finally enacted or under other appropriate laws.

That the association as organized agrees to buy, and the growers agree to sell and deliver to the association, all the cotton produced or acquired by or for the growers and signers in Louisiana during the years 1923, 1924, 1925, 1926, and 1927. That if by January 1, 1923, signatures of cotton growers to at least 75,000 bales of cotton of the 1921 crop shall not have been secured for the agreement, the organization committee shall notify every subscriber prior to January 15, 1923, and cancel his signature and the agreement signed by him. If signatures of the growers of 75,000 bales shall be secured by said date, January 1, 1923, then the agreement shall be binding upon all the subscribers in all its terms and there shall be no right of withdrawal whatever.

It was stipulated that in all matters of contract or signatures, and for all statements of fact in connection therewith, the written statement of the organization committee signed by its chairman shall be absolutely conclusive, with or without notice to the subscriber.

It was further agreed by the cotton grower that his signature to the association contract and to the marketing agreement and to the application for membership shall be irrevocable, except as provided in the paragraph which fixed the minimum number of bales required to be signed up.

It was agreed that should the grower fail to sell and deliver all his cotton to the association he was to pay to the association five cents per pound middling cotton for all cotton he so failed to deliver, as liquidated damages for the breach of his contract.

The grower also agreed that in event of his breach of the contract in failing to deliver his cotton, or on the threatened breach thereof, the association should have the right to sue out an injunction to prevent the sale and delivery of his cotton otherwise than as provided in the contract.

In the event any legal action became necessary to enforce the terms of the agreement, the signer agreed to pay all costs and expenses, including a reasonable attorney fee.

The defendant, J. E. Bacon, executed and signed one of the printed forms of agreement and delivered the same to the organization committee, and thereby became a member of the association on its incorporation, conditioned, of course, on the committee's securing contracts of growers of the crop of 1921 amounting at least to 75,000 bales.

The defendant delivered his cottton of 1923 crop to the association, but failed to deliver any of the crop of 1924, shipping the same instead to W. B. Thompson of this city.

The association thereupon in November, 1924, instituted suit in the district court of St. Landry parish, the domicile of said Bacon, to recover the stipulated damage of five cents per pound on 100 bales of the average weight of 500 pounds, and for $700 attorney fees.

An injunction was obtained after preliminary hearing against the defendant and W. B. Thompson, to whom the said cotton had been shipped.

The petition alleges that the association had performed all the conditions of its agreement with the cotton growers; that by January 1, 1923, the signatures of cotton growers covering over 75,000 bales of the crop of 1921 were secured by the organization committee and were delivered to said committee prior to that date.

It is further alleged that on March 7, 1923, petitioner accepted the application of the said Bacon and ratified said agreement; and on the same day mailed a notice of such acceptance and of his membership in the said association, all as provided for in the association agreement.

In answer to the petition, the defendant, among other defenses, alleged that the promoters and organizers of the plaintiff association made an illegal attempted organization thereof in violation of the conditions contained in the preliminary applications for membership and in the form of the contract.

He avers that he is informed and believes, and so believing alleges that said association commenced business at the instance of its promoters before contracts had been entered into with bona fide growers of cotton who then actually controlled 75,000 bales, or who had controlled that quantity of cotton of the 1921 crop; that said association commenced business in direct violation of the suspensive condition contained in the contract which stipulated that all signed preliminary agreements would be canceled and the signatures thereon erased, if the organization committee of said association failed to secure by January 1, 1923, the signatures of growers covering at least 75,000 bales of cotton; that said condition of the preliminary contracts and applications for membership, and particularly respondent's application and preliminary contract, was a suspensive condition which was of the essence of the contract, and that failure to perform said contract during the term fixed ipso facto released respondent from said contract, and that said contract never obtained force and effect as against respondent, and accordingly respondent now pleads the nullity of said contract.

It is further alleged that defendant did not learn of the violation of this condition of the contract until the fall of 1924, long after he had shipped his 1923 cotton to said association.

It is further alleged that the defendant is informed and believes that the promoters

and solicitors of plaintiff corporation, either through mistake and error, or through fraudulent intent, entered false returns and reports so as to make it appear on the records of said association that it had obtained control of the marketing of 75,000 bales of cotton, when as a matter of fact said condition had not been complied with.

There are other matters of defense set up in the answer, which for the purpose of present consideration need not be referred to.

After the answer was filed, the defendant filed a motion for a subpœna duces tecum commanding the plaintiff association to produce and file in open court, on a day fixed, the original association agreement alleged by plaintiff to have been signed by January 1, 1923, by cotton growers and others eligible to membership, and alleged to cover 75,000 bales of cotton of the crop of 1921, and to produce sworn copies of such contracts in lieu of any of the same which may be temporarily out of their possession, or which for any other reason it is impossible for the plaintiff to produce in the original form, and likewise to produce and file sworn lists or other records giving in detail the names and addresses of all and each of the cotton growers or other persons eligible to membership, alleged to have signed by January 1, 1923, association agreements similar to the one signed by the defendant, together with a detailed list of the number of bales of the cotton of the 1921 crop, control of which was credited to each of said signers by the several members or by said association, its employees, solicitors, officers, or organization committee in calculating the total number of bales of which said association claimed to have obtained control by January 1, 1923.

It is alleged in the motion that the defendant hopes and intends to establish by said original contracts, or by the sworn copies thereof and the other records of plaintiff association, that the allegation that the plaintiff had complied with all the conditions of the agreement sued on was untrue; that the allegation that plaintiff association had obtained the signatures of cotton growers covering 75,000 bales of cotton of the 1921 crop up to January 1, 1923 was erroneous, false, and fraudulent; that the solicitors, organization committee and officials and employees erroneously, falsely, and fraudulently credited to various signers of association agreements the control of much more cotton than said signers actually produced or controlled; that when the alleged association agreements, held by plaintiff, have been properly checked and culled, and when erroneous, false, and fraudulent credits of cotton are excluded from consideration, the total number of bales actually controlled by said association by January 1, 1923, will fall considerably below the minimum of 75,000.

The plaintiff excepted to the motion for the production of the papers on the ground that its domicile is outside the parish of St. Landry, and none of the documents which said subpœna orders plaintiff to produce is located in said parish of St. Landry; that for this reason the court of St. Landry was without jurisdiction ratione materiæ to issue said subpœna.

It was further submitted that a written statement of the chairman of the organization committee showed that prior to January 1, 1923, signatures of cotton growers covering 81,145 bales of cotton of the 1921 crop had been secured to the said printed form and delivered to the organization committee prior to the 1st day of January, 1923; that for that reason the documents, which said subpœna commands plaintiff to produce, are not material in the case, and defendant under an express stipulation in the contract is concluded, and that he has no right to have said documents produced.

It is further alleged that the contracts

called for are more than 5,000 in number, are very bulky, and are exceedingly valuable, as they are the very foundation on which plaintiff's whole structure rests; that they are regularly kept by said association in its offices in the city of Shreveport, are a part of its archives; and that it is absolutely necessary to the business of the plaintiff that said contracts be kept therein; and that plaintiff cannot, under any circumstances, afford to cart them from one jurisdiction to another jurisdiction in the state.

The exceptions to the rule to produce were overruled, and the court thereupon ordered the plaintiff to produce in court the documents as described and as prayed for in the motion to produce.

Thereafter the court amended or modified the order for the issuance of the subpœna duces tecum, so as to permit the plaintiff to furnish sworn copies of the documents called for instead of the originals.

The plaintiff then applied to this court for writs of certiorari, prohibition, and mandamus to the end that the legality of the proceedings may be inquired into, and that in due course the district judge be restrained and prohibited from taking for confessed the matters sworn to by the defendant, and directing the said judge to sustain the exceptions pleaded by relator herein to the said subpœna duces tecum.

In response to the rule nisi the original record has been sent up, and an answer filed on the part of the respondent judge and the defendant.

It is urged on the part of respondents that the application of relator is premature, since no judgment taking for confessed the facts set out in the motion for a subpœna duces tecum has been rendered in the court below, and that relator's proper remedy would have been by appeal after such order or judgment was rendered.

After setting out the facts substantially as we have given them, but more elaborately, the respondent judge denies that in granting the writ of duces tecum both as originally drawn and as amended, and in overruling relator's exceptions, he exceeded his jurisdiction, or that he went beyond his legitimate power, or abused the discretion vested in him.

[1] The objection to the relator's application to this court as being premature in our opinion is not well founded. The relator was justified in assuming that, if it failed to produce the documents called for, the facts set out in the motion would be taken for confessed, which fact would have resulted in the rejection of its demand.

[2] The same authority, which authorizes the issuance of a duces tecum, also declares in positive terms that, upon refusal to comply with the demand, the facts stated and sworn to shall be considered as having been confessed.

[3] If it should be found that the order to produce was illegally or improvidently issued, as contended by relator, then unquestionably the relator had the right to refuse to comply with such order, and to invoke the supervisory power of this court. An appeal after the rule had been made absolute and judgment rejecting plaintiff's demand had been rendered would not have afforded the plaintiff effective relief.

A question similar in some respects was presented in the case of State ex rel. Franklin v. Judge, 104 La. 301, 29 So. 114, in which the court said, in part:

"It is true the law says the order must describe such books, papers, or documents as are wanted (Code Prac. art. 473); and had the plaintiff and intervener, or their manager, made timely objection to the order on this ground, and the court a qua had notwithstanding persisted in maintaining the order in sweeping terms requiring the production of all of the books, without any attempt at description, seasonable application here for the intervention of this court to correct the proceeding would have met with ready response."

159 LOUISIANA REPORTS

If the party, against whom such an order has been rendered as referred to in the foregoing case, where the only objection was as to the want of sufficient description of the documents called for, is entitled to call in aid the supervisory powers of this court to prevent putting into execution such a defective and insufficient order; then surely this court would not refuse to entertain an application for similar relief, where, as in this case, the absolute want of power and jurisdiction of the court a qua to issue the order complained of is made the basis of the application.

We shall forego any discussion or consideration of the question raised in the application and controverted in respondent's answer to the effect that the defendant, Bacon, has been concluded by the stipulation of his contract from denying the fact that a sufficient number of bales of cotton had been signed up prior to January 1, 1923, to keep in force and effect the agreement executed by him.

That question pertains to the merits of the controversy and on which and in this proceeding we can express no opinion.

Nor from the conclusion the court has reached on the right of the defendant to compel the production of the papers described is it necessary to determine the question as to whether the facts, which it is claimed the documents will establish, are material to the issue involved in the main suit.

[4] The authority of the court on application of a litigant to compel his adversary to bring into court books and papers in his possession, and which are material in the cause is to be found in articles 140 and 473 of the Code of Practice.

The terms of the articles are very broad and general and if applied literally, then no litigant, residing within or without the jurisdiction of the court in which the cause is pending, would be excused from compliance with the mandate of the court. And no books, documents, or papers having a material bearing on the issues involved in the cause, and in the possession of one of the litigants, would be excepted from the rule, however voluminous and weighty such books, documents, and papers may be, or however great the charges of transportation.

But there are exceptions to all general rules, and the courts ex rei necessitate have refused to make a strict and literal interpretation of the article in question.

In the case of Cooper v. Polk, 2 La. Ann. 158, the court said:

"When a party to a cause lives out of the parish where the court is held, we cannot recognize the right of his adversary to compel him to bring all his commercial books from his domicile, to the seat of justice where the litigation is pending. It is true that the language of the Code of Practice (arts. 140, 473) is general; but if the interpretation we are asked to give be sound, then a merchant in New York or London might be compelled by his debtor to bring his books to Louisiana. Such a hardship imposed upon litigants, would make the relations of a factor with a planter, or of a merchant generally with his correspondents, very onerous, and is not to be sanctioned."

See to the same effect Ludeling v. Frellsen, 4 La. Ann. 534; Murison v. Butler, 18 La. Ann. 296; Cain v. Pullen, 34 La. Ann. 511.

In the Cain-Pullen Case, supra, it was said:

"It has been held in several adjudications upon this article (C. P. 140) that when the party against whom the order is directed, lives out of the parish where the court is being held, that he cannot be compelled to bring his books from his domicile or place of business to the place where the litigation is pending."

"And it is well settled in such cases, that sworn copies of the papers desired will suffice."

Exceptional cases may arise where it would be as onerous and burdensome and work as great a hardship to compel a litigant to bring, from his domicile or place of business beyond the jurisdiction of the court, where the cause is pending, sworn copies of

books, papers, and documents, as it would be to transport the originals thereof.

In such a case, we imagine the court would find no difficulty in refusing to follow the strict and literal interpretation of the article of the Code, as the court refused to do in the Cooper Case, supra.

The respondent judge admits that it would be unreasonable to order a business house or a banker to produce all its original credit ledgers and other account books in court in another parish—thus himself making another exception to the literal requirements of the Code.

But why make an exception in favor of the business house and the banker? We do not find that the statute makes any difference in the class of persons, or the nature of the business the transactions of which are evidenced by the books and papers. The rule of unreasonableness is as applicable to a private individual, or a collection of individuals, or a corporation of farmers, as it is to a business house or a banker.

[5] The record shows that there are some 5,000 of the marketing agreements called for, representing as many different individual cotton growers. These printed contracts are all of the same tenor, and are exact duplicates of the one before the court and attached to the plaintiff's petition. They constitute the very basis and foundation of the plaintiff's organization.

They are alleged to be in the plaintiff's branch office in the city of Shreveport. With the exception of the name of the signer and the number of bales such signer produced or controlled in 1921, the 5,000 agreements would prove nothing more than the copy of the agreement on file in the case.

It would therefore be very harsh and unreasonable to require the plaintiff to produce all these agreements in the court where the suit is pending.

For the same reason it would be very onerous, burdensome, and expensive for the plaintiff to have certified copies of the 5,000 agreements to be made. Each of these agreements contains 12 pages of very fine print, which, if copied, for all 5,000 agreements would make at least 50,000 typewritten pages.

In view of these facts, it would be manifestly unjust and unfair, and would impose too great a burden on the plaintiff organization to compel it to produce all the original agreements or to make verified copies of the same.

[6] There is another principle which may be applied here, and which is recognized in some jurisdictions and is referred to with approval in 18 Corpus Juris, 1125, and it is this: That if the application for the production of books and papers as evidence shows that there are other sources of information open to the party, then the applicant must show an exhaustion of such sources.

[7] The plaintiff claims, in its petition, that the defendant is a member of the organization. The plaintiff could not therefore be heard to deny the defendant the right to inspect the books and papers of the organization, and to make copies thereof. The defendant in that manner, and by that means, could very readily obtain all the facts which he desires and hopes to prove by the production of either the original or certified copies of the stated contracts and agreements.

It would be entirely different if the plaintiff were a private citizen, for in that case the defendant would have no legal right to claim an examination and inspection of such books and papers.

In these circumstances, we do not think that the defendant can shift the burden and the expense of producing the originals or of making copies on to the plaintiff.

Our conclusion is that the learned respondent judge was not warranted in issuing the subpœna duces tecum.

For the reasons assigned, the writs herein issued are made peremptory, to the extent, and it is hereby so decreed; that the order and judgment of the respondent judge, commanding and directing the plaintiff to produce in his court all the documents and papers described in such order, or sworn copies thereof, be, and the same is, vacated and set aside; that the respondent, J. E. Bacon, pay the costs of this proceeding.